**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

THOMAS JOHN VICE,

  Petitioner,

v.            Case No. 8:25-cv-2647-WFJ-AAS

SECRETARY, DEPARTMENT
OF CORRECTIONS,

  Respondent.

_____/

**ORDER**

Thomas John Vice, a Florida prisoner, initiated this action by filing a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1). Respondent filed a response opposing the petition. (Doc. 7). Although afforded the opportunity, Mr. Vice did not submit a reply. After careful review, the petition is **DENIED**.

**I. Background**

This case arises from two shooting incidents that occurred in Polk County, Florida on September 17, 2016. Around 3:45 p.m. that day, Jonathan Tupps and his wife were driving north on Route 98. (Doc. 7-1, Ex. 5, at 211-12, 395). Mr. Tupps looked in his rearview mirror and saw a "silver car" "swerving in and out of traffic." (*Id.* at 212). The car almost "clipped" his rear bumper. (*Id.* at 213). At the next light, Mr. Tupps gave the driver the middle finger. (*Id.*) When the two cars stopped side-by-side at the next intersection, the driver rolled down the passenger-side window, pointed a "black handgun" at Mr. Tupps's car, and fired "four to six" shots. (*Id.* at 216-17). Mr. Tupps and his wife

1

were not hit, and their car sustained no damage. (*Id.* at 217). Mrs. Tupps called 911 to report the shooting, describing the car as "a silver hatchback" with "greenish-colored taillights." (*Id.* at 237).

Approximately thirty minutes later, another shooting took place at a trailer park in Polk County. (*Id.* at 252, 395). Inside one trailer were four people: Jeannette Smith, her aunt Terry Pike, and Ms. Smith's two children. (*Id.* at 249). Jessica Brumfield—Ms. Smith's sister—also lived there, but she was at work at the time. (*Id.* at 249-50). Ms. Brumfield's car was, however, parked outside the trailer. (*Id.* at 250). A silver hatchback slowly pulled up to Ms. Brumfield's trailer and stopped. (*Id.* at 342-43). The driver fired six shotgun "slugs" at the trailer. (*Id.* at 343-44, 474, 492). He then drove away "real slow," making a U-turn at a dead end. (*Id.* at 344). As residents began exiting their trailers, the driver "turned around and blasted down the street as hard as th[e] car could go." (*Id.*) The slugs did not hit anybody inside the trailer, but there were "[b]ullet holes everywhere." (*Id.* at 255).

Around 4:15 p.m., law enforcement issued a "be on the lookout" for the silver hatchback. (*Id.* at 460-61). Minutes later, officers found a vehicle that matched the description and conducted a traffic stop. (*Id.* at 461-62). Mr. Vice was the vehicle's sole occupant. (*Id.* at 397). As they approached on foot, officers "immediately detected the odor of cannabis." (*Id.* at 395). A search of the vehicle uncovered a Smith & Wesson revolver, a "short-barrel" twelve-gauge shotgun, three spent shotgun shells, a ski mask, and a "marijuana cigarette butt." (*Id.* at 408, 440, 484). Subsequent testing showed that Mr. Vice had gunshot residue on both hands. (*Id.* at 551).

Law enforcement brought Mr. Tupps to the scene of the traffic stop. (*Id.* at 220). He identified Mr. Vice as the person who had shot at his car on Route 98. (*Id.* at 221, 223). Law enforcement also drove three witnesses from the trailer park to the scene of the traffic stop. Each identified Mr. Vice's car as the one that had fled after its driver shot at the trailer. (*Id.* at 346-47, 357, 375-76). Ms. Smith (Ms. Brumfield's sister) later testified that, when she emerged from the trailer after the shooting, she saw Mr. Vice's car "driving [away] very fast." (*Id.* at 254).

Law enforcement soon learned that Mr. Vice was Ms. Brumfield's ex-boyfriend. (*Id.* at 263-64). The two dated for approximately four months, and the relationship ended two months before the shootings. (*Id.*) Ms. Brumfield broke up with Mr. Vice because he was "very . . . controlling" and "erratic [in] behavior." (*Id.* at 264). After the breakup, Mr. Vice called Ms. Brumfield "a hundred times a day" and repeatedly showed up uninvited to her job and trailer. (*Id.* at 265). Two weeks before the shootings, Mr. Vice parked his father's car in a "dark area" by the trailer. (*Id.* at 265-66). When Ms. Brumfield and Ms. Smith exited the trailer, Mr. Vice drove toward them "as fast as he could," jumped out of the car, and called Ms. Brumfield a "whore." (*Id.* at 266). During another post-breakup incident, Mr. Vice told Ms. Brumfield that he had gotten her name tattooed on his wrist. (*Id.* at 267). The tattoo was directly above another tattoo that read #AlwaysRemember. (*Id.* at 268, 498).

For the road-rage shooting, Mr. Vice was charged with two counts of attempted second-degree murder, discharging a firearm from a vehicle, and shooting into an occupied vehicle. (*Id.*, Ex. 2, at 1-2). For the trailer shooting, he was charged with aggravated

3

stalking, four counts of attempted first-degree murder, shooting into a building, and discharging a firearm from a vehicle. (*Id.* at 2-3). Lastly, based on the items recovered from his car, Mr. Vice was charged with possession of a short-barreled shotgun, carrying a concealed firearm, possession of cannabis, and possession of drug paraphernalia. (*Id.* at 3-4).

The case went to trial. (*Id.*, Ex. 5). Mr. Vice was acquitted of all counts related to the road-rage shooting. (*Id.*, Ex. 9, at 1-2). For the trailer shooting, he was convicted of shooting into a building, discharging a firearm from a vehicle, and four counts of the lesser-included offense of attempted aggravated battery. (*Id.* at 2-3). For the attempted-aggravated-battery counts, the jury found that Mr. Vice "actually possess[ed]" and "personally discharge[d]" a firearm. (*Id.* at 6-9). The jury hung on the aggravated-stalking count, and it found Mr. Vice guilty of possession of a short-barreled shotgun, possession of cannabis, and possession of drug paraphernalia.[1] (*Id.* at 1, 3). Mr. Vice received a total sentence of twenty-five years' imprisonment. (*Id.*, Ex. 12). His direct appeal was unsuccessful, as were his efforts to challenge his convictions under Florida Rule of Criminal Procedure 3.850. (*Id.*, Ex. 17; Doc. 7-2, Exs. 33, 37). This federal habeas petition followed. (Doc. 1).

---

[1] The trial court granted Mr. Vice's motion for judgment of acquittal on the charge of carrying a concealed firearm. (Doc. 7-1, Ex. 5, at 618). He was not retried for aggravated stalking.

4

## II.     Standards of Review

### A.     AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application

of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The appellate court in Mr. Vice's case affirmed his convictions, as well as the denial of postconviction relief, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

### B.      Exhaustion of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

### C.    Ineffective Assistance of Counsel

Mr. Vice alleges ineffective assistance of trial counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id.* at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Mr. Vice must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, Mr. Vice must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA deference, the resulting standard of review is doubly deferential."). "The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

### III.    Discussion

#### A.    Ground One—Denial of Motion to Sever

Mr. Vice argues that the trial court erred in denying his motion to sever the road-rage charges from the trailer-shooting charges. (Doc. 1 at 5). The court declined to sever the two sets of charges, reasoning that "the crimes [were] linked in a significant way and . . . the facts occurred during a 'spree' interrupted by no significant period of respite." (Doc. 7-1, Ex. 4). This ruling was affirmed without explanation. (*Id.*, Ex. 15, at 16-23; Ex. 17). According to Mr. Vice, severance was required because the "shooting[s] were not connected by temporal or geographical proximity." (Doc. 1 at 5).

This claim fails for three reasons. First, it is not cognizable on federal habeas review. "[F]ederal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Whether Mr. Vice "was entitled to severance" is a matter of Florida law, and he does not allege in his petition that the severance ruling violated the federal constitution. *Puiatti v. McNeil*, 626 F.3d 1283, 1308 (11th Cir. 2010); *see also* Fla. R. Crim. P. 3.152(a) (setting out standard for "[s]everance of offenses" under Florida law). Thus, "[t]o the extent that [Mr. Vice] contends that the state trial court abused its discretion under Florida law in denying his motion for severance of offenses, the claim is not cognizable on federal habeas review because it involves only an alleged error in state law." *James v. Sec'y, Dep't of Corr.*, No. 8:15-cv-2332-CEH-AAS, 2018 WL 4565753, at *16 (M.D. Fla. Sept. 24, 2018); *see also Campana v. Sec'y, Dep't of Corr.*, No. 8:15-cv-895-CEH-TGW, 2018 WL 3208371, at *5 (M.D. Fla. June 29, 2018) ("[Petitioner] alleges that the trial court

9

erred in denying his motion to sever his trial . . . . Initially, the claim is not cognizable because it fails to allege a federal constitutional violation.").

Second, even if the petition could be liberally construed as attacking the severance ruling on federal constitutional grounds, Mr. Vice would not be entitled to relief because he failed to exhaust the federal nature of his claim. Proper exhaustion requires a petitioner to "make the state court aware that the claims asserted present federal constitutional issues." *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1342 (11th Cir. 2007). To exhaust a claim, a petitioner must "do more than scatter some makeshift needles in the haystack of the state-court record." *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005). Thus, "a petitioner with a claim that could arise under either state or federal law must clearly indicate to the state courts that he intends to bring a federal claim." *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 458 (11th Cir. 2015).

Mr. Vice argued on direct appeal that the "trial court erred in denying the motion to sever the incidents." (Doc. 7-1, Ex. 15, at 13). But he couched his argument in terms of state law. He relied on Florida Rule of Criminal Procedure 3.152(a), the statute "governing severance of offenses" in Florida trial courts. (*Id.* at 16). And he cited only Florida appellate decisions interpreting Rule 3.152(a). (*Id.* at 16-22). The sole reference to a federal basis for the claim was a single sentence in the final paragraph of the section: "The error denied [Mr. Vice] his rights to due process and a fair trial. Sixth and Fourteenth Amendments, U.S. Constitution; Art. 1 Sections 2, 9, 16, and 22, Fla. Constitution." (*Id.* at 23). This "vague and passing reference" was "not enough to make the state court[] aware of the federal nature of his claim[]." *DiTullio v. Sec'y, Dep't of Corr.*, No. 22-13609, 2025 WL 784713,

10

at *3 (11th Cir. Mar. 12, 2025) (petitioner failed to exhaust where "[t]he only reference in his state appellate briefs to a federal basis for his claim was a single vague allusion to his 'rights to due process and to a fair trial, as guaranteed by the Florida and United States Constitutions' in the final sentence of the section"). Indeed, "[t]he mere incantation of constitutional buzzwords, unaccompanied by any federal constitutional analysis, does not suffice to carry the burden of demonstrating fair presentment of a federal claim." *Means v. Sec'y, Dep't of Corr.*, No. 1:14-cv-230-WTH-GRJ, 2018 WL 992027, at *1 (N.D. Fla. Feb. 20, 2018). "Because the gravamen of his claim, as presented to the state court[], dealt with state law," Mr. Vice "failed to exhaust his federal claim." *Preston*, 785 F.3d at 458.[2]

Third, even if the federal issue had been properly exhausted, Mr. Vice cannot show that the rejection of his claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "'[C]learly established Federal law' for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014). The Supreme Court has repeatedly cautioned lower courts against framing its decisions at "a high level of generality." *Nevada v. Jackson*, 569 U.S. 505, 512 (2013); *see also Brown v. Davenport*, 596 U.S. 118, 136 (2022)

---

[2] *See also McNair*, 416 F.3d at 1303 (no exhaustion where petitioner cited one federal district court decision and argued that he suffered violation of rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law"); *Snyder v. Fla. Dep't of Corr.*, No. 23-12972, 2024 WL 4867047, at *1 (11th Cir. Nov. 22, 2024) ("[Petitioner's] single reference to the due process clauses of the state and federal constitutions in the closing paragraph of his argument failed to put the state court on notice of the federal issue."); *Ramos v. Sec'y, Fla. Dep't of Corr.*, 441 F. App'x 689, 696-97 (11th Cir. 2011) (no exhaustion where sole reference to federal law was statement that "this evidence was so devastatingly prejudicial that its introduction violated [petitioner's] Florida and federal constitutional rights to due process and a fair trial and the error was fundamental").

(noting that "holdings that speak only at a high level of generality" "cannot supply a ground for relief" under AEDPA). Accordingly, "it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009); *see also Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1288 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law.").

The Supreme Court has never "squarely established" a constitutional standard for the severance of offenses. *Knowles*, 556 U.S. at 122. As several lower courts have recognized, "[t]here is no clearly established Supreme Court precedent dictating when a trial in state court must be severed." *Martinez v. Yates*, 585 F. App'x 460 (9th Cir. 2014); *see also Grajeda v. Scribner*, 541 F. App'x 776, 778 (9th Cir. 2013) ("The Supreme Court has not held that a state or federal trial court's denial of a motion to sever can, in itself, violate the Constitution."); *Wheeldon v. Campbell*, No. 16-2054, 2017 WL 3165083, at *3 (6th Cir. Mar. 6, 2017) (noting that "the Supreme Court has not held improper joinder to be unconstitutional"). Without Supreme Court authority on point, Mr. Vice cannot show that the rejection of his claim violated clearly established federal law. *See Woodall*, 572 U.S. at 426 ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error.").

12

### B.       Ground Two—Failure to Prove Shooter's Identity

Mr. Vice argues that the evidence at trial was insufficient to identify him as the trailer-park shooter. (Doc. 1 at 7). According to him, he "was never seen at the shooting scene, just a vehicle that somewhat matched his." (*Id.*) Moreover, Mr. Vice complains that the evidence against him was "solely . . . circumstantial." (*Id.*) Because the evidence allegedly failed to "prove the identity of the shooter," Mr. Vice contends that his convictions violated the Due Process Clause. (*Id.*)

Respondent argues that Mr. Vice's sufficiency challenge is unexhausted, but the Court need not reach that issue because the claim fails on the merits. *See Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020) ("[A] federal court may skip over the procedural default analysis if a claim would fail on the merits in any event."); *see also Cook v. McNeil*, 266 F. App'x 843, 846 (11th Cir. 2008) (affirming denial of habeas petition because, "[e]ven if [petitioner] exhausted his due process claim," he could not "establish either that the state courts applied a standard contrary to federal law or that they applied that precedent in an unreasonable manner"); *Acosta v. Artuz*, 575 F.3d 177, 188-89 (2d Cir. 2009) ("Even if we were to assume that [petitioner] adequately exhausted state remedies on the precise challenge to the admission of his confession that he now raises in his habeas petition, we would agree with the district court that no relief is warranted because [he] has not demonstrated that the state court's rejection of his claim on the merits was an objectively unreasonable application of clearly established Supreme Court precedent.").

Under *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), a court reviewing a challenge to the sufficiency of the evidence must evaluate whether, "after viewing the evidence in

13

the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard does not require the prosecution "to rule out every hypothesis except that of guilt beyond a reasonable doubt." *Id.* at 326. If the record contains facts supporting conflicting inferences, the jury is presumed to have "resolved any such conflicts in favor of the prosecution." *Id.* The *Jackson* standard "is equally applicable to direct or circumstantial evidence." *Martin v. State of Alabama*, 730 F.2d 721, 725 (11th Cir. 1984).

Consistent with AEDPA, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

Mr. Vice cannot meet this demanding standard. Contrary to his assertion, the prosecution presented ample evidence that he was the shooter at the trailer park. When Ms. Smith emerged from the trailer after the shooting, she "recognized" the car that sped away as belonging to "Thomas Vice"—the man who had dated her sister (Ms. Brumfield) for several months. (Doc. 7-1, Ex. 5, at 254). Minutes after the shooting, Mr. Vice was pulled over in a vehicle that matched the description provided in the "be on the lookout." (*Id.* at 397, 461-62). Soon after, three witnesses identified Mr. Vice's car as the one that had fled the trailer park after its driver shot at Ms. Brumfield's trailer. (*Id.* at 346-47, 357, 375-76). A search of the car uncovered a twelve-gauge shotgun and three spent shotgun shells—a notable discovery given that the shooter had fired shotgun "slugs" at the trailer. (*Id.* at 343-

14

44, 408, 440, 474, 492). Moreover, subsequent testing showed that Mr. Vice had gunshot residue on both hands. (*Id.* at 551). On top of all this, Ms. Brumfield had broken up with Mr. Vice two months before the shooting. (*Id.* at 263-64). After the breakup, he called her "a hundred times a day," repeatedly showed up uninvited to her job and trailer, and got her name tattooed on his wrist. (*Id.* at 265, 267-68, 498).

Viewed "in the light most favorable to the prosecution," this evidence would allow a "rational trier of fact" to find beyond a reasonable doubt that Mr. Vice was the shooter. *Jackson*, 443 U.S. at 319.

### C. Ground Three—Failure to File Motion to Suppress Vehicle Identifications

Three witnesses—Mark Ellis, Donald Huffman, and Danny Atchley—saw a silver car flee the scene after the trailer shooting. (Doc. 7-1, Ex. 5, at 346-47, 357, 375-76). Mr. Ellis was "sitting on his porch" when he saw a silver hatchback pull up in front of Ms. Brumfield's trailer. (*Id.* at 341, 348). He heard "shots" and saw "holes opening up" on the trailer. (*Id.* at 343). Mr. Ellis observed the car drive away "real slow" and make a U-turn at a dead end. (*Id.* at 344). As residents began to leave their trailers, Mr. Ellis saw the car "turn[] around and blast[] down the street." (*Id.*) Mr. Huffman was sitting at a "picnic table" next to Mr. Ellis's trailer when the shooting happened. (*Id.* at 353). Mr. Huffman heard "a couple booms go off," then saw a silver car "go by twice." (*Id.* at 354). Mr. Atchley was "[t]hree trailers away" from Ms. Brumfield's trailer when he "heard gunshots" and went outside. (*Id.* at 373). He saw a silver "sports car" "go[] down the road, turn[] around, come[] back by, and then turn[] around again." (*Id.* at 374).

15

Approximately thirty minutes after the shooting, law enforcement drove each witness from the trailer park to the parking lot where Mr. Vice had been stopped. Mr. Ellis and Mr. Huffman were passengers in the same patrol vehicle; Mr. Atchley rode with another trailer-park resident who saw the shooting. (*Id.* at 359, 375). Mr. Ellis, Mr. Huffman, and Mr. Atchley identified Mr. Vice's car as the one that had fled after its driver shot at the trailer. (*Id.* at 346-47, 357, 375-76).

Mr. Vice now contends that trial counsel should have moved to suppress the vehicle identifications. (Doc. 1 at 8). According to him, law enforcement "conducted . . . unnecessarily suggestive show-up identification[s]." (*Id.*) Specifically, Mr. Vice complains that the witnesses "were driven together" and did not receive "instructions" "regarding the show-up."[3] (*Id.*)

The postconviction court reasonably concluded that Mr. Vice suffered no prejudice because any motion to "suppress[] . . . the identification of [the] vehicle" "would have been denied." (Doc. 7-2, Ex. 33, at 1). "Out-of-court identifications are examined for due process violations using a two-part test: The court must first decide whether the [procedure] was impermissibly suggestive, and if it was suggestive the court must then determine whether the identification procedure created a substantial likelihood of misidentification." *United States v. Smith*, 459 F.3d 1276, 1294 (11th Cir. 2006). Undue suggestion does not require

---

[3] In his petition, Mr. Vice refers to "the identification of the Defendant" rather than the identification of the vehicle. (Doc. 1 at 8). The substance of the claim makes clear, however, that Mr. Vice challenges only the vehicle identifications. (*Id.*) Regardless, as Respondent correctly points out, Mr. Vice failed to exhaust—and thus procedurally defaulted—any claim that counsel should have sought to suppress Mr. Tupps's identification of Mr. Vice as the road-rage shooter. (Doc. 7 at 52-53). Moreover, Mr. Vice suffered no prejudice from Mr. Tupps's identification because he was acquitted of all counts related to the road-rage incident.

16

exclusion of the resulting identification if, "under the totality of the circumstances, the identification was nonetheless reliable." *United States v. Diaz*, 248 F.3d 1065, 1102 (11th Cir. 2001).

Even if the identification procedure in this case was unduly suggestive, a reasonable jurist could conclude that a motion to suppress would have failed because the identifications were "nonetheless reliable." *Id.* "Factors to be considered in determining whether the identification was reliable include: (1) opportunity to view; (2) degree of attention; (3) accuracy of the description; (4) level of certainty; and (5) length of time between the [encounter] and the identification." *Diaz*, 248 F.3d at 1102 (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)); *see also Pittman v. State*, 646 So. 2d 167, 171 (Fla. 1994) (applying *Biggers* factors to witness identification of vehicle).

Here, each witness had sufficient "opportunity to view" the shooter's car. *Diaz*, 248 F.3d at 1102. All three testified that after the shooting, the car drove past them twice. (Doc. 7-1, Ex. 5, at 344, 354, 374). At first, the car moved "real slow," but it eventually "turned around and blasted down the street." (*Id.* at 344). The witnesses likely paid a high "degree of attention" to the car because they had just heard gunshots. *Diaz*, 248 F.3d at 1102; *see also Howard v. Bouchard*, 405 F.3d 459, 483 (6th Cir. 2005) (witnesses' attention "became greater when the shooter began to fire shots"). Moreover, the witnesses displayed a high overall "level of certainty" when they identified the car. *Diaz*, 248 F.3d at 1102. Mr. Ellis testified that he was "positive" "it was the same car"; Mr. Huffman saw "the rear" of the car and said "yes, that is the car"; and Mr. Atchley said he was "[p]ositive" the car was the one that had sped away after the shooting. (*Id.* at 347, 360, 376). In addition, the

17

identifications were made only thirty minutes after the incident. (*Id.* at 350; *see also United States v. Caldwell*, 963 F.3d 1067, 1076 (11th Cir. 2020) (finding identification reliable where it occurred "just over 30 minutes after the robbery")). It is true that the witnesses' descriptions of the vehicle (a silver car) were rather vague. (*E.g.*, Doc. 7-1, Ex. 5, at 368). But a reasonable jurist could conclude that, "under the totality of the circumstances, the identification[s] [were] nonetheless reliable." *Diaz*, 248 F.3d at 1102; *see also Sexton v. Beaudreaux*, 585 U.S. 961, 967 (2018) (reasonable jurist could find identification reliable despite "vague initial description of the shooter").

For these reasons, a fairminded jurist could agree that the proposed motion to suppress lacked merit. Mr. Vice thus suffered no prejudice from counsel's failure to raise the issue. *See United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) ("[A] lawyer's failure to preserve a meritless issue plainly cannot prejudice a client.").

**D.      Ground Four—Failure to File Motion to Suppress Cell Phone Evidence**

Shortly after the shootings, law enforcement obtained a search warrant for Mr. Vice's cell phone. (Doc. 7-1, Exs. 6, 7). The warrant allowed officers to search the phone for (1) any "text messages or telephone communication between the victim, Jessica Brumfield, and the suspect, Thomas Vice, during the beginning of their relationship in April 2016 until September 17, 2016 [the day of the shootings]"; and (2) any "photographs, videos, ledgers (written or electronic), telephone records, telephone numbers, website activity, or GPS locations showing [Mr.] Vice's whereabouts from April 2016 until September 17, 2016." (*Id.*, Ex. 6, at 3). The affidavit in support of the search-warrant

18

application stated that such evidence could be relevant to "the counts of attempted murder with a firearm." (*Id.* at 5).

Only two pieces of evidence from the cell phone were introduced at trial. First, a detective testified that the cell phone contained a photograph of the tattoo on Mr. Vice's wrist bearing Ms. Brumfield's name. (*Id.*, Ex. 5, at 496-98). Second, the detective testified that he retrieved cell phone location data for the date of the shootings. (*Id.* at 501). The data showed that approximately ten minutes before the road-rage shooting, Mr. Vice "left his house [and] traveled about .4 miles" before "the location [was] turned off." (*Id.*)

Mr. Vice contends that trial counsel should have moved to suppress the cell phone evidence because the search warrant was "illegal." (Doc. 1 at 10). According to him, law enforcement failed to "prove a nexus" between the cell phone and "evidence of a crime." (*Id.*) In other words, there was allegedly no basis to conclude that the cell phone would contain evidence that "a crime had been committed." (*Id.*)

The postconviction court held that "no prejudice [could] be shown" because "there was probable cause to issue the warrant" and, thus, any "motion to suppress would have failed." (Doc. 7-2, Ex. 33, at 1). This ruling was reasonable. "A sufficient basis for probable cause for a search exists when under the totality of the circumstances there is a fair probability that . . . evidence of a crime will be found in a particular place." *United States v. Lopez*, 649 F.3d 1222, 1245 (11th Cir. 2011). "A 'fair probability,' in turn[,] exists when the facts and circumstances would lead a reasonably prudent person to believe that the place to be searched contains . . . evidence of a crime." *Id.* "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not

readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

The information in the search-warrant affidavit established a "fair probability" that "evidence of a crime" would be found in Mr. Vice's cell phone. *Lopez*, 649 F.3d at 1245. The affidavit recounted the trailer shooting and the evidence pointing to Mr. Vice as the culprit. (Doc. 7-1, Ex. 6, at 3-5). That evidence included the witnesses' identification of Mr. Vice's vehicle as the one that had fled the trailer park after the shooting. (*Id.* at 4-5). The affidavit noted that Ms. Brumfield "obtained a description of the vehicle from multiple witnesses . . . and believed her ex-boyfriend, Thomas Vice . . . , was the subject who shot her residence." (*Id.* at 4). According to the affidavit, Ms. Brumfield "dated [Mr.] Vice for three months but had to break up with him because she felt uneasy about the relationship." (*Id.*) Mr. Brumfield further stated that Mr. Vice "became obsessed with her and continued to call, text, and drive by her residence multiple times after she had requested that he stop." (*Id.*) She also expressed her belief that Mr. Vice "intended on harming her because her car was parked near the [trailer during the shooting] and she was driving a rental vehicle[,] which [he] did not know." (*Id.*)

Taken together, this information "would lead a reasonably prudent person to believe that" Mr. Vice's cell phone contained evidence of a crime. *Lopez*, 649 F.3d at 1245. The prosecution accused Mr. Vice of committing attempted murder by shooting at a trailer he believed to be occupied by Ms. Brumfield, his ex-girlfriend. (Doc. 7-1, Ex. 2, at 2-3). Any "evidence of the nature of [Mr. Vice's] relationship with [Ms. Brumfield] [would be] relevant to establish [his] motive" to kill her. *Dennis v. State*, 817 So. 2d 741, 762 (Fla.

20

2002). It would also "establish the entire context from which the charged crimes arose and [help] describe the events leading up to the charged crimes." *Barnes v. State*, 393 So. 3d 816 (Fla. 3d DCA 2024). There was a "fair probability" that such evidence would be found in the text messages between Mr. Vice and Ms. Brumfield. *Lopez*, 649 F.3d at 1245. Moreover, any evidence from Mr. Vice's phone that "show[ed] [his] whereabouts from April 2016 until September 17, 2016," could (1) corroborate Ms. Brumfield's allegation that Mr. Vice stalked her after the breakup and (2) place him at the scene of the shooting. (Doc. 7-1, Ex. 6, at 3).

Thus, the postconviction court reasonably concluded that Mr. Vice suffered no prejudice because a motion challenging the validity of the search warrant would have failed. *See Winfield*, 960 F.2d at 974 ("[A] lawyer's failure to preserve a meritless issue plainly cannot prejudice a client.").

### E.    Ground Six—Failure to Raise "Best Evidence" Objection to Cell Phone Evidence[4]

As noted above, the prosecution presented two pieces of evidence from Mr. Vice's cell phone. First, a detective testified that the cell phone contained a photograph of the tattoo on Mr. Vice's wrist bearing Ms. Brumfield's name. (Doc. 7-1, Ex. 5, at 496-98). Second, the detective stated that he obtained cell phone location data for the date of the shootings. (*Id.* at 501). The data showed that approximately ten minutes before the road-

---

[4] Ground Six is related to Ground Four. The Court thus addresses Ground Six before turning to Ground Five.

rage shooting, Mr. Vice "left his house [and] traveled about .4 miles" before "the location [was] turned off." (*Id.*)

Mr. Vice argues that trial counsel should have objected to both pieces of evidence under the "best evidence rule." (Doc. 1 at 13). "The best evidence rule requires that when the contents of a writing, recording, or photograph are being proved, the original must be offered unless a statutory excuse for the lack of an original exists." *Hernandez v. State*, 328 So. 3d 1064, 1066 (Fla. 4th DCA 2021). According to Mr. Vice, this rule was violated because "no forensic download was presented to the jury nor was the cell phone itself physically introduced." (Doc. 1 at 13).

The postconviction court reasonably rejected this claim for lack of prejudice. (Doc. 7-2, Ex. 33, at 2). "The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. "Applying AEDPA to *Strickland*'s prejudice standard, [the Court] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [Mr. Vice]—that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024).

22

Mr. Vice cannot make the required showing. The testimony about the tattoo photograph was cumulative of other evidence presented at trial. The jury learned that after his arrest, Mr. Vice told the detective he had Ms. Brumfield's "name tattooed on his arm." (Doc. 7-1, Ex. 5, at 494). The jury also heard that Ms. Brumfield herself described the tattoo to the detective. (*Id.* at 498). And Ms. Brumfield testified at trial about the tattoo, explaining that Mr. Vice "got [her] name tattooed on his wrist, but we weren't together." (*Id.* at 267). Significantly, defense counsel admitted that Mr. Vice got the tattoo after the breakup, and Mr. Vice showed the jury his tattoos during the defense case. (*Id.* at 555-56, 671). In closing argument, counsel downplayed the tattoo as a "dramatic gesture" that, while perhaps "stupid," was not "threatening" or "crazy." (*Id.*) Thus, the photograph of the tattoo was cumulative, and a "petitioner cannot establish ineffective assistance" based on the failure to seek exclusion of "evidence [that] is merely cumulative." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324 n.7 (11th Cir. 2002).

Nor was Mr. Vice prejudiced by the testimony about the cell phone location data. Even apart from that testimony, the prosecution presented "substantial evidence" of his guilt. *Fugate v. Head*, 261 F.3d 1206, 1224 (11th Cir. 2001); *see also McCoy v. Newsome*, 953 F.2d 1252, 1262 (11th Cir. 1992) ("[T]he other substantial evidence of [petitioner's] guilt negates any possibility of prejudice resulting from his attorney's [deficient conduct]."). As explained above, the evidence showed that (1) Ms. Smith, one of the occupants of the trailer, "recognized" the car that sped away as belonging to "Thomas Vice"; (2) minutes after the shooting, Mr. Vice was pulled over in a vehicle that matched the description provided in the "be on the lookout"; (3) three witnesses identified Mr.

23

Vice's car as the one that had fled the trailer park after its driver fired shotgun slugs at Ms. Brumfield's trailer; (4) Mr. Vice's car contained a twelve-gauge shotgun and three spent shotgun shells; (5) Mr. Vice had gunshot residue on both hands; and (6) Ms. Brumfield had broken up with Mr. Vice two months before the shooting, and he continually harassed her post-breakup. (Doc. 7-1, Ex. 5, at 254, 263-68, 343-47, 357, 375-76, 397, 408, 440, 461-62, 474, 492, 551). Additionally, neither side mentioned the location data in opening statements or closing arguments. (*Id.* at 196-210, 621-54, 660-90). Indeed, the data did not establish that Mr. Vice was present at either the road-rage shooting or the trailer shooting. (*Id.* at 501).

Given the strength of the prosecution's case—and the relative insignificance of the cell phone location data—a reasonable jurist could agree that the failure to object to the data did not prejudice Mr. Vice. *See Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d 1278, 1300 n.9 (11th Cir. 2014) ("The overwhelming evidence of [petitioner's] guilt . . . makes it obvious that [he] cannot show *Strickland* prejudice.").

### F.    Ground Five—Failure to "Adequately Cross-Examine" Detectives and Object to Their Testimony

Two detectives—Robert Berganza and Ryan Thomas—interviewed Mr. Vice after his arrest. (Doc. 7-1, Ex. 5, at 485-86). Mr. Vice received a *Miranda*[5] warning and orally agreed to speak to the detectives, but there is no indication that he signed a *Miranda* waiver form. (*Id.* at 487-88). In addition, the jury did not hear a recording of the interview. Instead, each detective testified to what Mr. Vice said. At the time of the interview, Detective

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Berganza was investigating the road-rage shooting. (*Id.* at 482). According to him, Mr. Vice denied "that he had been involved in any kind of dispute," although he "did agree that he had been driving on [Route] 98." (*Id.* at 486). Detective Thomas, by contrast, was investigating the trailer shooting. (*Id.* at 491). According to him, Mr. Vice "denied . . . ever going to [Ms. Brumfield's] house," claiming instead that he was "at the mall shopping" in North Lakeland. (*Id.* at 493-94).

Mr. Vice argues that trial counsel should have objected to the detectives' failure to "record the interrogation" and provide him with a *Miranda* waiver form. (Doc. 1 at 12). Moreover, counsel allegedly should have "impeached" the detectives by pointing out that their "testimony [about] the content of the interrogation vastly differed." (Doc. 7-2, Ex. 31, at 13).

The postconviction court reasonably rejected this claim for lack of prejudice. (*Id.*, Ex. 33, at 1-2). First, counsel had no legal basis to object to the failure to record the interview or provide a *Miranda* waiver form. *See Winfield*, 960 F.2d at 974 ("[A] lawyer's failure to preserve a meritless issue plainly cannot prejudice a client."). "Although a rule requiring the government to record statements made during custodial interrogations might be sound policy," "the Constitution does not require [courts] to adopt such a rule." *United States v. Boston*, 249 F. App'x 807, 810 (11th Cir. 2007) (collecting cases). And while "a signed *Miranda* waiver is usually strong evidence that the defendant waived his rights," "it is not necessary." *United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010). Mr. Vice does not contend that his oral *Miranda* waiver was involuntary, unknowing, or otherwise invalid. Because "the Fifth Amendment does not require a written *Miranda*

25

waiver," Mr. Vice's "oral waiver was sufficient." *United States v. Lopez*, No. 3:14-cr-21-TCB, 2015 WL 7176470, at *7 (N.D. Ga. Nov. 10, 2015).

Second, the "impeachment value" of the detectives' allegedly differing accounts of the interview was "weak." *Miller v. Sec'y, Dep't of Corr.*, No. 8:17-cv-2815-TPB-AEP, 2020 WL 7318967, at *28 (M.D. Fla. Dec. 11, 2020), *aff'd*, No. 21-10077, 2022 WL 3452468 (11th Cir. Aug. 18, 2022). As explained above, the detectives were investigating different incidents. Detective Berganza was assigned to the road-rage shooting, so he told the jury that Mr. Vice denied "that he had been involved in any kind of dispute" on Route 98. (Doc. 7-1, Ex. 5, at 482, 486). Detective Thomas was assigned to the trailer shooting, so he told the jury that Mr. Vice "denied . . . ever going to [Ms. Brumfield's] house." (*Id.* at 493-94). Had counsel highlighted the differences in the detectives' testimony, the prosecution likely would have pointed out that the detectives were tasked with investigating different crimes. Thus, there is no "reasonable probability that, but for counsel's [failure to pursue the proposed impeachment], the outcome at trial would have been different."[6] *Reed*, 767 F.3d at 1261.

---

[6] Mr. Vice claims that the detectives "used hearsay testimony regarding the interview." (Doc. 1 at 12). Presumably, this is a reference to the detectives' trial testimony about Mr. Vice's statements during the interview. Any hearsay objection to this testimony would have failed. "An admission of a party opponent is admissible as an exception to the hearsay evidence rule." *Morris v. State*, 233 So. 3d 438, 446 (Fla. 2018). Thus, "[w]hen offered by the State, a defendant's out-of-court statement falls under the admission exception to the rule against hearsay—it is offered 'against' the defendant and is his own statement." *Carter v. State*, 226 So. 3d 268, 271 (Fla. 4th DCA 2017).

**G.    Ground Seven, Sub-Claim A—Failure to Request 10/20/Life Jury Instructions**

As noted above, Mr. Vice was charged with four counts of attempted first-degree murder for shooting at Ms. Brumfield's trailer. (Doc. 7-1, Ex. 2, at 2-3). He was convicted of four counts of the lesser-included offense of attempted aggravated battery. (*Id.*, Ex. 9, at 2-3). As part of its verdict, the jury made "[s]pecial [f]indings" that "[d]uring the commission" of these offenses, Mr. Vice "actually possess[ed]" and "personally discharge[d]" a "firearm." (*Id.* at 5-9). These findings meant that, under Florida's 10/20/Life statute, Mr. Vice faced a mandatory minimum of twenty years' imprisonment for attempted aggravated battery. *See Blandin v. State*, 916 So. 2d 969, 970 (Fla. 2d DCA 2005) ("Because the defendant had discharged a firearm, . . . attempted aggravated battery with a firearm carried a twenty-year minimum mandatory sentence under [Fla. Stat. §] 775.087(2)(a)(2).").

Mr. Vice contends that trial counsel was deficient for failing to ensure that the jury instructions defined "actual possession" and "discharge of a firearm" for purposes of the 10/20/Life enhancement. (Doc. 1 at 14). There is no standard instruction defining "discharge of a firearm" under the 10/20/Life statute. Fla. Std. Jury Instr. (Crim.) 3.3(d). But the standard instruction for "actual possession" states that the term applies if the defendant either "carried a firearm on his person" or "had a firearm within immediate physical reach with ready access with the intent to use the firearm during the commission of the crime." *Id.*

The postconviction court concluded that Mr. Vice suffered no prejudice from the failure to request the instructions. (Doc. 7-2, Ex. 33, at 2). The court "incorporated . . . by reference" the State's response, which explained that Mr. Vice "did not contest that the trailer at issue was shot with a firearm on September 17, 2016." (*Id.* at 1; *see also id.*, Ex. 32, at 50). Instead, "the defense presented at trial was the State failed to prove beyond a reasonable doubt that [Mr. Vice] was the shooter." (*Id.*) As the response correctly pointed out, "for the trailer to have been shot, the shooter would have had to actually possess and discharge a firearm." (*Id.*) Thus, because the "only contested issue" at trial was Mr. Vice's "identity as the shooter," no "*Strickland* prejudice" resulted from the failure to define actual possession or discharge of a firearm. (*Id.* (emphasis omitted)).

This ruling was reasonable. To show prejudice, Mr. Vice must "establish a reasonable probability that the result of the trial would have been different had the jury received [the requested] instruction[s]." *Porter v. Dixon*, No. 4:23-cv-419-WS-ZCB, 2024 WL 4716027, at *7 n.12 (N.D. Fla. Sept. 30, 2024), *adopted by* 2024 WL 4710374 (N.D. Fla. Nov. 7, 2024). He cannot do so. As the postconviction court explained, there was no dispute at trial that the trailer-park shooter both possessed and discharged a firearm. (Doc. 7-2, Ex. 33, at 2; *see also* Doc. 7-2, Ex. 32, at 50). The only issue was the shooter's identity. Definitions of actual possession or discharge of a firearm would have had no bearing on the jury's resolution of the identity issue. Thus, there is no "reasonable probability that, had the jury received [the requested instructions]," it would have found that Mr. Vice did not possess or discharge a firearm. *Veach v. Sec'y, Fla. Dep't of Corr.*, No. 22-11882-E, 2022 WL 17367844, at *2 (11th Cir. Sept. 29, 2022).

28

**H.    Ground Seven, Sub-Claim B—Failure to Object to Attempted-Aggravated-Battery Instructions**

According to Mr. Vice, trial counsel should have objected to the jury instructions on attempted aggravated battery. (Doc. 1 at 14). Mr. Vice argues that these instructions were "illegal" because attempted aggravated battery is not a lesser-included offense of attempted first-degree murder. (*Id.* at 14-15).

Even under *de novo* review, this claim fails. Contrary to Mr. Vice's assertion, "[a]ttempted aggravated battery is a necessary lesser-included offense of attempted first-degree murder." *Perez v. Sec'y, Dep't of Corr.*, No. 8:18-cv-520-CEH-SPF, 2020 WL 7861427, at *21 (M.D. Fla. Dec. 31, 2020); *see also Lathan v. State*, 270 So. 3d 1262, 1265 (Fla. 5th DCA 2019) ("For the charged crime of attempted first-degree murder . . . , there are four category one, necessarily lesser-included offenses[, including] . . . attempted aggravated battery."). Mr. Vice's proposed objection is thus meritless. And "[f]ailing to make a meritless objection does not constitute deficient performance." *Denson v. United States*, 804 F.3d 1339, 1342 (11th Cir. 2015).

**I.    Ground Eight—Cumulative Error**

Mr. Vice contends that the "cumulative effect" of trial counsel's alleged errors "deprived [him] of a fair trial." (Doc. 1 at 16). "Under the cumulative-error doctrine, a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial." *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014). A cumulative-error claim "must fail," however, where none of the "individual claims of error" has "any merit." *Morris v.*

29

*Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). Mr. Vice is not entitled to relief on any individual claim of ineffective assistance. Thus, his cumulative-error claim necessarily fails.

### J.    Ground Nine—Allegedly Illegal Sentences

Lastly, Mr. Vice contends that his "constitutional rights" were violated by the concurrent twenty-year sentences he received for each count of attempted aggravated battery. (Doc. 1 at 17). According to him, these sentences "exceed[ed] the statutory maximum." (*Id.*)

Even under *de novo* review, this claim lacks merit. Typically, "[a]ttempted aggravated battery is a third-degree felony punishable up to five years['] incarceration." *Washington v. State*, 912 So. 2d 344, 346 (Fla. 3d DCA 2005). But under Florida's 10/20/Life statute, "attempted aggravated battery" carries "a twenty-year minimum mandatory sentence" when the defendant "discharge[s] a firearm." *Blandin*, 916 So. 2d at 970. And "where the 10-20-Life statute is implicated, a sentencing judge may impose a mandatory minimum sentence in excess of the statutory maximum sentence, even if the selected mandatory minimum exceeds the statutory maximum absent the 10-20-Life statute." *Collins v. State*, 228 So. 3d 1160, 1161 (Fla. 1st DCA 2017).

That is what happened here. The jury determined that Mr. Vice discharged a firearm when he committed attempted aggravated battery. (Doc. 7-1, Ex. 9, at 5-9). The "jury finding" of "discharge of a firearm" "raise[d] the mandatory minimum sentence [for attempted aggravated battery] to twenty years in prison." *State v. Perez Franco*, No. 1D2023-1916, 2026 WL 679566, at *4 (Fla. 1st DCA Mar. 11, 2026) (emphasis omitted).

30

This allowed the trial court to sentence Mr. Vice to the twenty-year mandatory minimum for each count of attempted aggravated battery. Because Mr. Vice's sentences fell "within the applicable statutory range," he fails to "present a cognizable constitutional issue." *Butler v. Sec'y, Dep't of Corr.*, No. 8:12-cv-56-JDW-TGW, 2015 WL 859487, at *11 (M.D. Fla. Feb. 27, 2015).

## IV.   Conclusion

Accordingly, the Court **ORDERS**:

1. Mr. Vice's petition (Doc. 1) is **DENIED**.

2. The **CLERK** is directed to enter judgment against Mr. Vice and to **CLOSE** this case.

3. Mr. Vice is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Mr. Vice must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Mr. Vice has not made the requisite showing. Because Mr. Vice is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on April 2, 2026.

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE